NO.
12-06-00316-CV

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

THE STATE OF TEXAS FOR        §                      APPEAL FROM THE 

 

THE BEST INTEREST AND          §                      COUNTY COURT AT LAW

 

PROTECTION OF C.L.       §                      CHEROKEE
COUNTY, TEXAS

                                                                                                                                                           


MEMORANDUM OPINION

            C.L. appeals
from an order for temporary inpatient mental health services.  In his sole issue on appeal, C.L. asserts
that the evidence presented was legally and factually insufficient to support
the order.  We affirm.

 

Background








            On
August 4, 2006, an application for court ordered temporary mental health
services was filed requesting that the trial court commit C.L. to Rusk State
Hospital (“RSH”) for a period not to exceed ninety days.  At the time the application was filed, C.L. was
a patient at RSH.  The application was
supported by two physicians’ certificates of medical examination for mental
illness.  The first certificate stated
that, on August 3, 2006, Dr. Catir Cuellar evaluated and examined C.L. and
diagnosed him with schizo-affective disorder. 
According to Dr. Cuellar, C.L. was mentally ill and, as a result, was
likely to cause serious harm to himself. 
Dr. Cuellar reached these conclusions because C.L. said that the United
States was in a civil war, believed that computers were sending deadly missiles
against his dog, and had been living in filth and neglecting himself.  Dr. Cuellar also stated in his certificate
that C.L. presented a substantial risk of serious harm to himself or others if
not immediately restrained, which was demonstrated by C.L.’s behavior and by
evidence of severe emotional distress and deterioration in C.L.’s mental
condition.        

            The
second certificate stated that, on August 4, 2006, Dr. Larry Hawkins evaluated
and examined C.L. and diagnosed him with schizo-affective disorder.  Dr. Hawkins stated that C.L. had been
receiving medications under his direction. 
According to Dr. Hawkins, C.L. was mentally ill and was likely to cause
serious harm to others.  Dr. Hawkins
reached these conclusions because C.L. exhibited pressured speech and flight of
ideas, was very paranoid about the government, exhibited grandiose behavior
saying “I am the chosen one,” was found swimming (allegedly naked) in a public
ditch, had failed to care for himself, and had maintained his residence in an
unsanitary living condition.  In regard
to C.L.’s residence, Dr. Hawkins stated that someone reported there were “maggots
all over [C.L.’s] house.”  

            The
hearing on the application was held on August 22, 2006.  Both physicians’ certificates were offered
into evidence.  At the hearing, Dr. Jon
Guidry testified as an expert in mental health care.  He testified that he had reviewed C.L.’s
medical records and that he had last examined C.L. during the week prior to the
hearing.  He testified that C.L. suffered
from schizo-affective disorder, bipolar type; was likely to cause serious harm
to himself; and  was experiencing a
substantial mental deterioration of his ability to function independently.  He reached these conclusions because C.L. believed
people were looking for him in an attempt to harm him and force him to give
them money, had purposely changed the condition of his home in an attempt to
conceal his whereabouts,[1] and had been swimming in a ditch.

            Dr.
Guidry testified that C.L. was an extremely delusional individual and would
regress to a manic state if prematurely released.  He stated that C.L.’s medication had
temporarily relieved C.L.’s manic symptoms, but continued medication was
necessary to prevent a regression.  Dr.
Guidry stated that this was so because C.L. was still delusional and would be
free to explore and build upon these delusions if released from RSH.  He stated that C.L. was responding to treatment,
and he anticipated that C.L would require only an additional two weeks at RSH
to reach the maximum possible benefit.  

         During cross examination, Dr. Guidry
admitted that he did not know of any overt act committed by C.L. by which he
attempted to harm himself.  Dr. Guidry
admitted that C.L. was currently able to obtain food and feed himself and
obtain clothes and clothe himself.  He
admitted that C.L. would know to seek treatment for a broken arm.  He also admitted that C.L. would know to remove
his foot from a fire ant hill and to exit a burning building.  Nonetheless, Dr. Guidry testified that C.L.
would not be able to take care of his personal safety if prematurely released. 

            C.L.’s
sister, Teresa, testified that C.L. told her he had been swimming in a ditch in
his underwear.  She also said that she
saw C.L. afterward and that he had been bitten by mosquitos and other bugs “from
head to toe.”  As a result, she had to
take him to a hospital emergency room. 
She further testified that C.L. had “completely destroyed” his
home.  

            Teresa
stated that she was worried for C.L.’s safety. 
She testified that C.L. was under the delusional belief that people were
trying to poison him.  Teresa described
other behavior exhibited by C.L. such as threatening her, spraying down pizza
delivery men with a water hose, breaking out windows with his hands, using
illegal drugs, and walking around his yard in his underwear.  She further testified that C.L. was not able
to buy food for himself because he had decision making problems.  As an example, she cited an instance in which
C.L. accepted a pizza from a pizza delivery man, but then closed the door in
the man’s face without paying for the pizza.

            C.L.
testified as the sole witness in support of his release from RSH.  C.L denied that he had been swimming in a
ditch, but admitted that he was near the ditch while wearing only
underwear.  C.L. agreed that he once had
said the United States was in a civil war, but stated that he knew this was not
true.  As to the missiles being fired at
his dog, C.L. said that he had been told by his nephew that inmates at a jail
were the ones firing the missiles.  C.L.
also said that he had recently ridden in a van that had an ejection seat for the
front passenger.

            When
asked about why he purposely damaged his home, C.L. testified that people were
trying to harm him and to make him “go crazy.” 
C.L stated that the people believed he had large sums of money that he
inherited from his deceased father.  C.L.
admitted that he did not have the money, but asserted that this was the belief
of the people who were after him.  He
testified that he had set up his home “as a trap” for the people.  He stated that the people were currently
incarcerated and thus not a present threat to him.  He said that if he found out that some of the
people were not incarcerated, his best course of action would be to set up his
home as before.

            C.L.
testified that he wished to be released from RSH so he could return to his
home.  He said that he did not wish to
harm himself or others and that he had never threatened to harm himself.  C.L. testified that, while living at his
home, he had prepared his own food and bought his own clothes.      At
the conclusion of the hearing, the trial court found that C.L. was mentally ill,
and as a result was likely to cause serious harm to himself; suffering severe
and abnormal mental, emotional, or physical distress; experiencing substantial
mental or physical deterioration of his ability to function independently,
which was exhibited by his inability, except for reasons of indigence, to
provide for his basic needs, including food, clothing, health, or safety; and
unable to make a rational and informed decision as to whether or not to submit
to treatment.  The trial court entered an
order for temporary inpatient mental health services committing C.L. to RSH for
a period not to exceed ninety days.  This
appeal followed.

 

Sufficiency
of the Evidence

            C.L.
argues that the evidence was neither legally nor factually sufficient to
support the order of commitment.  More
specifically, he contends that the evidence failed to show an overt act or
continuing pattern of behavior tending to confirm the likelihood that he would
cause serious harm to himself, that he was suffering from severe distress, or
that his ability to function was deteriorating. 
Standard of Review

            In
a legal sufficiency review where the burden of proof is clear and convincing
evidence, we must look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a
firm belief or conviction that the finding was true.  In re J.F.C., 96 S.W.3d 256,
266 (Tex. 2002).  We must assume that the
fact finder settled disputed facts in favor of the finding if a reasonable fact
finder could do so and disregard all evidence that a reasonable fact finder
could have disbelieved or found incredible. 
Id.  This does not
mean that we are required to ignore all evidence not supporting the finding
because that might bias a clear and convincing evidence analysis.  Id.

            The
appropriate standard for reviewing this factual sufficiency challenge is
whether the evidence is such that a fact finder could reasonably form a firm
belief or conviction that the finding was true. 
In re C.H., 89 S.W.3d 17, 25 (Tex. 2002).  In determining whether the fact finder has
met this standard, we consider all the evidence in the record, both that in
support of and contrary to the finding.  Id.
at 27-29.  Further, we must consider
whether disputed evidence is such that a reasonable fact finder could not have
reconciled that disputed evidence in favor of the finding.  In re J.F.C., 96 S.W.3d at
266.  If the disputed evidence is so
significant that a fact finder could not reasonably have formed a firm belief
or conviction, then the evidence is factually insufficient to support the
finding. Id.

Applicable Law

            A
trial judge may order a proposed patient to receive court ordered temporary
inpatient mental health services if the judge, from clear and convincing
evidence, finds that the proposed patient is mentally ill and, as a result of
the mental illness, is likely to cause serious harm to himself, is likely to
cause serious harm to others, or is (1) suffering severe and abnormal mental,
emotional, or physical distress, (2) experiencing substantial mental or
physical deterioration of his ability to function independently, which is
exhibited by his inability, except for reasons of indigence, to provide for his
basic needs, including food, clothing, health, or safety, and (3) unable to
make a rational and informed decision as to whether or not to submit to
treatment.  Tex. Health & Safety Code Ann. § 574.034(a) (Vernon
2003). 

            To
be clear and convincing, the evidence must include expert testimony and, unless
waived, evidence of a recent overt act or a continuing pattern of behavior that
tends to confirm either the likelihood of serious harm to the proposed patient
or others or the proposed patient’s distress and the deterioration of his
ability to function.  Tex. Health & Safety Code Ann. §
574.034(d) (Vernon 2003).  Clear and
convincing evidence means the measure or degree of proof that will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of
the allegations sought to be established. 
State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).  The statutory requirements for an involuntary
commitment are strict because it is a drastic measure.  In re C.O., 65 S.W.3d 175, 182
(Tex. App.–Tyler 2001, no pet.). 

Legal Sufficiency

            Dr.
Guidry testified at the hearing that C.L. believed people were looking for him
to try to harm him and force him to give them money.  Dr. Guidry also said that, in an attempt to
conceal himself from these people, C.L. changed the condition of his home.  According to Dr. Guidry, C.L. told him that
he made his home “look like a deathtrap because people are after me.”  C.L.’s sister, Teresa, said that C.L. had “completely
destroyed” his home.  This overt act,
damaging his home, tends to confirm that C.L. was suffering severe and abnormal
mental, emotional, or physical distress. 
A reasonable trier of fact could have formed a firm belief or conviction
that C.L. was suffering severe and abnormal distress as a result of his mental
illness.

            Dr.
Guidry also testified that C.L. would not be able to care for his own personal
safety if he were released prematurely from RSH.  He based his opinion on C.L.’s behaviors of
swimming in a ditch, damaging his home, and living in unsanitary
conditions.  Teresa confirmed that C.L.
had been swimming in a ditch.  She
testified that, when she saw him afterward, she took him to a hospital
emergency room because he had been bitten by mosquitos and other bugs from “head
to toe.”  Teresa also testified that C.L.
had used illegal drugs and had used his hands to break out windows.  C.L. himself admitted purposely damaging the
condition of his home.  This evidence
shows a continuing pattern of behavior that tends to confirm C.L.’s inability
to provide for his own personal safety. 
A reasonable trier of fact could have formed a firm belief or conviction
that, as a result of C.L.’s mental illness, C.L. was experiencing a substantial
mental deterioration of his ability to function independently.  Therefore, the evidence was legally
sufficient to support the trial court’s findings of distress and
deterioration.  See Tex. Health & Safety Code Ann. § 574.034.

Factual Sufficiency

            Having
determined that the evidence was legally sufficient to support the trial court’s
order, we address factual sufficiency and consider all of the evidence, both
that in support of and contrary to the trial court’s findings.  See In re C.H., 89 S.W.3d at
27-29.

            Based
upon our review of the record as a whole, we note that there is some evidence
that is contrary to the trial court’s findings. 
Dr. Guidry testified that C.L. would seek medical attention for a broken
arm, remove himself from an anthill, and evacuate himself from a burning
building.  Also, C.L. testified that he
had not been swimming in a ditch.  The
trial court was entitled to disregard evidence contrary to its findings and to
disbelieve C.L.’s testimony.  See id.
at 27.  In light of the entire record,
the evidence that the trial court could not have credited in favor of its
findings is not so significant that it could not form a firm belief or
conviction that C.L. was suffering severe and abnormal mental distress and
experiencing a substantial mental deterioration of his ability to function
independently.  See In re R.S.C.,
921 S.W.2d 506, 509-11 (Tex. App–Fort Worth 1996, no writ). Therefore, the
evidence is factually sufficient to support the trial court’s findings of
distress and deterioration.  See Tex. Health & Safety Code Ann. § 574.034;
In re J.F.C., 96 S.W.3d at 266.

            Having
determined that the evidence is legally and factually sufficient to support one
of the criteria for committing C.L. to RSH, we need not consider the additional
criteria used to support the commitment. 
See Tex. Health &
Safety Code Ann. § 574.034(a); Tex.
R. App. P. 47.1.  We conclude that
the trial court met the obligations imposed by section 574.034 of the Texas
Health and Safety Code and overrule C.L.’s sole issue.

 

Disposition

            The judgment
of the trial court is affirmed.

 

 

 

                                                                                                    SAM GRIFFITH   

                                                                                                               Justice

 

 

Opinion delivered January 31,
2007.

Panel consisted of Worthen,
C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

(PUBLISH)











[1] C.L. said “I made it look like a deathtrap
because people are after me.”